IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| DANIEL JOSEPH LEFFLER,<br>      Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY<br>      Defendant. | Case No. 1:15-cv-01254-JEH |

## Order and Opinion

Now before the Court is the Plaintiff Daniel Joseph Leffler's Motion for Summary Judgment (Doc. 11) and the Commissioner's Motion for Summary Affirmance (Doc. 15). For the reasons stated herein, the Court DENIES the Plaintiff's Motion for Summary Judgment and GRANTS the Defendant's Motion for Summary Affirmance.[1]

**I**

On October 11, 2012, Leffler filed an application for disability insurance benefits (DIB) alleging disability beginning on March 1, 2012. His claim was denied initially on February 13, 2013 and was denied upon reconsideration on November 5, 2013. On November 11, 2013, Leffler filed a request for hearing concerning his application for DIB. A hearing was held before the Honorable Diane Raese Flebbe (ALJ) on October 27, 2014, and at that time Leffler was represented by an attorney and a Vocational Expert (VE) testified. Following the

---

[1] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears as (Doc. 6) on the docket.

1

hearing, Leffler's claim was denied on December 19, 2014. His request for review by the Appeals Council was denied on April 20, 2015, making the ALJ's Decision the final decision of the Commissioner. Leffler filed the instant civil action seeking review of the ALJ's Decision on June 22, 2015.

## II

At the time he applied for benefits, Leffler was 45 years old living in Canton, Illinois with his wife and minor daughter. In 1983, Leffler had an accident which necessitated the amputation of the big and second toes on his left foot. He worked in the years following his foot injury, but had not worked since his alleged onset date of March 1, 2012. On his Form SSA-3368, Leffler listed all the physical and mental conditions he had that limited his ability to work as follows: burning feet, ankles, neuropathy, diabetes, crushed foot; learning disabilities ADHD; neuropathy legs and arms, hands; diabetes type 2; arthritis in feet and neck; crushed left foot missing 2 toes and 1 1/2 metatarsal; numb hands and feet or burning; carpel tunnel and left hand 2 trigger fingers; whiplash; depression; and high cholesterol.

At the hearing, Leffler testified that he had multiple surgeries on his left foot following his 1983 accident and he ultimately lost two toes and approximately two inches behind the toes. He testified that his foot never returned to the condition it was in before the 1983 accident. He explained that he received various treatments for the foot since the accident including a "silicon shot," wrappings, and an orthotic. Leffler also testified to some constant numbness, tingling, and burning in both of his feet due to neuropathy for which he took Gabapentin. He stated that he also experienced lower back pain due to "a few chips on [his] discs in [his] lower back." AR 65. He rated his back pain as an 8 or 9 on a typical day and explained that his pain medication helped, but the pain was still there. Leffler confirmed

that he had no studies of his back done since January 2013. He testified that he did water therapy for his back and physical therapy, neither of which helped him.

Leffler then testified to left knee pain after he fell on it four or five years before the hearing, and his doctor's advice at the time was to leave it alone and it would slowly reduce in swelling. As for his foot, knee, and other issues, Leffler testified that his doctors did not proceed with surgeries because Leffler did not have health insurance to cover those procedures. Leffler also testified that at the time of the hearing, he knew he could not walk a block before he would have to stop and when asked if he ever used a cane or walk he responded, "I should use it because it would help me get up if I fall down. I mean, I use things to use." AR 76. He stated that he fell once a week, he could stand no more than a half an hour at one time while able to shift from one foot to the other, and he never sat comfortably. Leffler elaborated that while sitting he experienced lower back pain, leg numbness, and burning feet. He said that while his pain would still come back no matter what, it helped him to move different ways.

Leffler testified that he was treating with pain specialist Dr. Feather and believed Dr. Feather was in a position to know quite a lot about him. Leffler again noted that Dr. Feather would not treat him other than to give him pills because his insurance would not cover more than that. He further testified that a friend came to his home three to four times per week to help him out with laundry. He grocery shopped, did very little cooking, did yard work once in a while including mowing. With regard to shopping, Leffler explained that he sometimes rode a cart at the grocery store.

The ALJ then proceeded to question the VE, Ronald Malik. The ALJ first questioned the VE based upon the following hypothetical individual:

> [One with the] ability to perform sedentary and light exertion work with only occasional climbing ramps and stairs, balancing, stooping,

3

> kneeling, crouching, crawling. No climbing ladders, ropes or scaffolding. Please also assume the need to avoid concentrated exposure to hazards such as dangerous machinery and unprotected heights as well as vibrations. Please also assume that there is occasional operating foot controls with the left – or with the lower extremities . . . would you please assume occasional fine and gross manipulation with the left upper extremity, frequent fine and gross manipulation with the dominant right upper extremity, and also secondary to moderate . . . Would you please also assume there is a need for limitation to simple routine, and repetitive work with no more than occasional work interaction with supervisors and co-workers. With these limitations, would Mr. Leffler be able to perform past work?

AR 102-03. The VE responded that Leffler would not be able to perform his past work as a millwright helper. When Leffler's age, education, and work history were added to the hypothetical individual, the VE testified that the individual could perform jobs at both the light and sedentary levels of exertion. The ALJ again added to the hypothetical individual:

> Mr. Malik, if there was an ability to lift 20 pounds and carry occasionally, 10 pounds frequently, stand and walk up to 30 minutes at a time for a total of four hours a day, sit up to 60 minutes at a time for a total of six hours a day, occasionally twist, crouch -- or no, twist, climb stairs, climb ladders, reach, handle, finger, feel, push, pull without limits, but never stoop or bend, and never crouch. And avoid moderate exposure to temperature extremes, wetness, humidity, odors, dust, gases and other environmental irritants. Noise is described by a numeric construct in the DOT, so noise at level 3 or less as in the SCO, the Selected Characteristics of Occupation, and no work with hazards, such as dangerous machinery and unprotected heights. Are any of the jobs you identified still okay?

AR 104-05. The VE responded that the identified sedentary jobs would still be available and there would only be one light job remaining in reduced numbers. Further colloquy ensued between the ALJ and VE and Leffler's attorney and the VE, including the ALJ's statement to the VE in which she started to ask the VE

4

about adding to the hypothetical a sit/stand option though she determined it was somewhat incorporated already because she already included "30 minutes at a time, 60 minutes at a time" so that she guessed the sit/stand option was already part of the hypothetical. Leffler's attorney did not interject. Leffler's attorney later stated, "Okay. All right. I think you had basically covered the sit/stand option. Let me talk to you about the numbers that you've provided for these jobs . . . ." AR 109.

### III

In her Decision, the ALJ determined that Leffler had the following severe impairments: lumbar spine degenerative disc disease with small protrusions; left foot deformity, status post amputation and with osteoarthritis; bilateral carpal tunnel syndrome, status post right carpal tunnel release; left trigger fingers; left knee bursitis and mild tendinosis with degenerative changes; obstructive sleep apnea; diabetes mellitus with neuropathy; obesity; depression; and attention deficit hyperactivity disorder. The ALJ made the following RFC finding:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary and light work as defined in 20 CFR 404.1567(b) except he is restricted to occasional climbing of ramps and/or stairs, balancing, stooping, kneeling, crouching, crawling, and fine and gross manipulations with the non-dominant left upper extremity; he can perform frequent fine and gross manipulations with the dominant right upper extremity; he can occasionally operate foot controls with his lower extremities; he cannot climb ladders, ropes, or scaffolds; he must avoid concentrated exposure to vibrations and hazards such as dangerous machinery and unprotected heights; and he is limited to simple, routine, and repetitive tasks with no more than occasional work interactions with supervisors and coworkers.

AR 28.

The ALJ discussed Leffler's February 2014 left knee MRI which revealed bursitis, mild distal quadriceps tendinosis, and degenerative changes to grades 1 to 2.  She also discussed Leffler's January 2013 MRI of his lumbar spine which showed multiple disc degenerative changes from L2-3 through L5-S1 with some narrowing of the spinal canal but no neural encroachment, small protrusions at the L3-4 and L4-5 levels, circumferential epidural fat at all lumbosacral levels, and no significant thecal sac constriction.  She set forth the results of a December 2012 nerve conduction and EMG study which showed evidence of axonal sensory neuropathy.

At different times in her Decision, the ALJ considered Leffler's reports and testimony of frequent falling.  The ALJ noted that the record did not reflect an inability to ambulate effectively, Leffler was often observed to ambulate with normal gait (citing to various medical records, including those from his treating Dr. Feather), and Leffler did not require the use of an assistive device.  The ALJ also cited to Leffler's November 2012 and June 2013 Function Reports in which he indicated an ability to carry out routine ambulatory activities including shopping, yard work, and taking out the garbage.  Specifically in his 2012 report, Leffler stated that he could walk 100 feet before needing to stop for 20 to 30 minutes, was able to mow the lawn for 45 minutes to two hours, rake leaves, and do repairs.  In his 2013 report, Leffler stated that his ability to walk decreased to only 30 feet at a time before resting.  The ALJ recounted the medical evidence pertaining to Leffler's degenerative disc disease which did not establish evidence of nerve root compression, spinal arachnoiditis, or spinal stenosis resulting in an inability to ambulate effectively.

The ALJ further addressed Leffler's alleged lower back pain, again citing to the imaging results which showed no evidence of radiculopathy or mononeuropathy.  The ALJ also noted the lack of evidence to support his

allegations regarding the severity of his pain such as muscle atrophy, neurological deficits, or loss of motor functioning. His straight leg raise tests performed by Consultative Examiner Dr. Vittal Chapa (CE), a neurologist, and Dr. Feather were all negative. While he had some abnormality in range of motion, he had no instability and maintained normal posture and gait. While Dr. Feather's examinations sometimes showed abnormal lumbar palpation, Dr. Feather on at least one occasion noted Leffler showed Waddell's signs of over-reaction.

Turning to Leffler's "only documented complication from [his] diabetes," neuropathy, the ALJ again noted the medical evidence showing bilateral foot numbness and tingling paresthesias as well as axonal sensory neuropathy. The ALJ contrasted those medical findings with Leffler's use of Gabapentin used to treat his neuropathy only two times per day rather than the prescribed three times per day, his maintenance of a normal gait, and the absence of recommendation by clinicians that he use an assistive device.

The ALJ pointed out that Leffler continued to work for many years as a laborer after his initial left foot injury in 1983, and that he reported increased left foot pain in June 2012 when he was referred to an orthopedic clinic the following month. Records showed that Leffler developed significant midfoot arthritis, but his x-rays showed his ankle and joints in good condition and they had a normal range of motion, and Leffler had intact strength in all directions. In the time following Leffler's receipt of an orthotic, the record does not reflect additional appointments for his left foot pain with the orthopedic clinician. The ALJ pointed out that nor did the record reflect that Leffler sought follow up care in the two years that passed since he was prescribed the use of the orthotic.

The ALJ discussed Leffler's reported knee pain, and again noted imaging results of his left knee as well as his orthopedic specialist's observation that Leffler

had full range of motion and no instability and essentially normal x-ray results. The ALJ concluded:

> Overall, while the claimant has shown changes on diagnostic imaging, his clinical examinations showing good range of motion and strength without loss of stability, minimal treatment, and interpretation of his findings by his treating physician do not suggest an impairment of a severity that would preclude work consistent with the residual functional capacity finding above.

AR 31.

The ALJ returned to Leffler's neuropathy and lower extremity impairments, and considered them more fully in combination. The ALJ found that Leffler did not show substantial deficits in his ambulation that supported his allegations that he could walk only 30 feet at a time and fell every week. In support of her finding the ALJ pointed to doctors' repeated observations of intact gait and coordination at appointments, a limp favoring the left foot though the ability to still bear weight and ambulate without aids, Leffler's denied use of an assistive device and prescription for such despite reporting six falls in four months, his denial of a history of falling on other occasions, and his failure to report frequent falls to Dr. Feather or any other clinician.

The ALJ also considered at length Leffler's frequent reports of very high pain levels and detailed the instances in which he rated his pain very high while examinations and observations of him at that time failed to indicate acute distress or extreme pain. The ALJ again noted Leffler's reduced use of Gabapentin and the Waddell's signs of over-reaction during one appointment. Later, in considering the credibility of Leffler's subjective complaints, the factors of 20 C.F.R. § 404.1529(c), and the factors of Social Security Ruling 96-7p, the ALJ determined that Leffler did not show consistency in his treatment seeking behavior and complaints when seeking treatment that mirrored his allegations he made in

8

connection with his application for DIB. Of note to the ALJ was the fact that Leffler's physicians did not pursue a course of treatment that would be expected if his impairments were as disabling as he alleged such that he was never referred for aggressive treatment such as surgery or steroid injections and they prescribed him only ibuprofen and Gabapentin.

The ALJ also addressed the third party function report provided by Leffler's ex-wife (then wife) and the letters submitted by Leffler's friend Karen Sager. The ALJ identified the differences between what the two women reported as to Leffler's ability to ambulate and engage in activities at home.

Considering the medical opinion evidence, the ALJ explained why she did not accept the degree of limitation in squatting and arising without support to which CE Dr. Chapa opined, why she restricted Leffler from concentrated exposure to hazards such as dangerous machinery or unprotected heights due to Dr. Patel's (treated Leffler's sleep apnea) opinion, and why she assigned "some weight" to and generally accepted the findings of the State Agency medical consultants. Particularly as to Dr. Feather, the ALJ discussed his two medical source statements providing for Leffler's significant functional impairment. The ALJ assigned these only "little weight" because they were "not supported by [Dr. Feather's] treating records or the medical evidence from other providers." AR 38. The ALJ cited to Dr. Feather's records indicating Leffler's appearance within normal limits, the absence in Dr. Feather's records of observations that Leffler had an abnormal gait or posture, and Dr. Feather's actual progress notes which did not indicate that he pursued a particularly aggressive course of care.

## IV

Leffler argues that the ALJ erred when she failed to analyze the opinions of Leffler's treating physician in accordance with 20 C.F.R. § 404.1527 and prevailing Seventh Circuit precedent which Leffler further argues led inexorably to an RFC

9

finding that did not capture all of the practical effects of all of his impairments, particularly his need to alternate between sitting and standing at will.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability. *See* 20 C.F.R. § 404.1566 (1986). The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th

Cir. 1980). The factual determination is made by using a five-step test. *See* 20 C.F.R. § 404.1520. In the following order, the ALJ must evaluate whether the claimant:

1) currently performs or, during the relevant time period, did perform any substantial gainful activity;

2) suffers from an impairment that is severe or whether a combination of her impairments is severe;

3) suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

4) is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and

5) is unable to perform any other work existing in significant numbers in the national economy.

*Id.* An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

In the instant case, Leffler claims error on the ALJ's part at Steps Four and Five.

## A

Leffler argues that the ALJ did not address all of the factors set forth in 20 C.F.R. § 404.1527, including the "obvious consideration" that Dr. Feather as

11

Leffler's treating physician was likely the most able to provide a detailed, longitudinal picture of his medical impairment, the consideration that Dr. Chapa as consultative examiner had medical expertise, and the consideration that Dr. Feather's and Dr. Chapa's opinions were consistent with each other.  Leffler ultimately contends that Dr. Feather's opinion as to Leffler's need to shift at will from sitting or standing/walking established greater limitations than those set forth in the ALJ's RFC finding.  The Commissioner disputes that Dr. Feather's opinion was rejected, and argues instead that Dr. Feather's opinion was discounted given various factors and yet the ALJ still presented most of the limitations to which Dr. Feather opined to the VE.  The Commissioner contends that the ALJ weighed Dr. Feather's opinions using regulatory factors such as supportability, consistency with the record, and the nature and extent of the treatment relationship.  The Commissioner also argues that the ALJ's Decision, read as a whole and with common sense explains why the sit/stand option was rejected and the ALJ did not need to separately discuss the checked box included in Dr. Feather's Medical Opinion Re:  Ability to Do Work-Related Activities (Physical).  Further, the Commissioner argues that Leffler does not actually defend Dr. Chapa's opinion, explain why it was entitled to significant weight, or show that it undermined the ALJ's Decision.

  Leffler has not shown that the ALJ committed reversible error in this case.  Though an ALJ must give controlling weight to the medical opinion of a treating physician, the ALJ must do so only if the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008), *citing Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006); 20 C.F.R. § 404.1527(c)(2). If the ALJ does not give a treating physician's opinion controlling weight, the Social Security regulations require the ALJ to consider: 1)

the length, nature, and extent of the treatment relationship; 2) the frequency of examination; 3) the physician's specialty; 4) the types of tests performed; 5) and the consistency and supportability of the physician's opinion. 20 C.F.R. § 404.1527; *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).

The ALJ in her Decision discussed at length and in great detail the instances in the record where Leffler's allegations as to disabling physical symptoms conflicted with the evidence of record, both medical and non-medical. In doing so, the ALJ also amply addressed the instances in the record where *Dr. Feather's* opinions as to the extent of Leffler's physical limitations conflicted with the evidence of record. In his Memorandum in support of his Motion for Summary Judgment, Leffler specifically notes the underlying medical evidence pertaining to his degenerative disc disease, his knee issues, and his foot pain. Notably, he does not point to any smoking gun evidence in regard to those conditions which exhibits that the ALJ committed reversible error with the way she considered them to reach her conclusion that Dr. Feather's opinions were not entitled to controlling weight. Instead, in her Decision the ALJ identified the medical and non-medical evidence pertaining to Leffler's degenerative disc disease, knee issues, and foot pain, and in doing so, she set forth "good/specific/supported reasons" for giving Dr. Feather's opinions only "little weight."

For example, the ALJ discussed Leffler's imaging records, an EMG and nerve conduction study, clinical signs, and examination results all regarding his lower back. Such things revealed normal gait and posture, relatively minor diagnostic findings, no suggestion of significant nerve root involvement, no evidence of radiculopathy or mononeuropathy, negative straight leg raise tests, no instability, and an instance of Waddell's signs of over-reaction. The ALJ also addressed Leffler's neuropathy and explained that he maintained normal gait and no clinician ever recommended the use of an assistive device, and the ALJ

addressed Leffler's left foot (toes) amputation and his x-ray results showing the ankle and joints in good condition, normal range of motion, and the lack of follow up by Leffler upon his receipt of an orthotic.

As for Leffler's knee issues, the ALJ first identified his knee diagnoses of bursitis, tendinosis, and grade 1 to 2 degenerative changes and then discussed his full range of motion, normal x-ray results, normal strength and range of motion, and minimal treatment. The ALJ explained that "despite the claimant's neuropathy and lower extremity impairments, he has not shown substantial deficits in his ambulation that support his allegations that he can walk only 30 feet at a time and falls every week." AR 32. The ALJ pointed to Leffler's primary care clinician's and pain management specialist's observation of intact gait and coordination at appointments, Leffler's ability to bear weight and ambulate without ambulatory aids, Leffler's denial that he used an assistive device, and Leffler's denial of a history of falling and not reporting falls to his pain institute or any other clinician though he previously reported in April 2013 and at the hearing that he fell frequently. The ALJ also explained that Leffler's "physicians have also not pursued a course of treatment that would be expected if his impairments were as disabling as he has alleged." AR 36. The ALJ further noted that Leffler's degree of functional limitation was not consistent with his reported activities. Clearly, the ALJ detailed how medically acceptable clinical and laboratory diagnostic techniques did *not* support Dr. Feather's opinions.

Moreover, it is apparent from a commonsensical and even close reading of the ALJ's Decision that she properly considered the factors under 20 C.F.R. § 404.1527(c) where she did not give Dr. Feather's opinions controlling weight. The Commissioner correctly notes that the ALJ identified Dr. Feather as Leffler's pain management specialist as early as October 2012 and as Leffler's "pain management physician" who provided medical source statements indicating significant

functional impairment. As illustrated above, the ALJ considered the types of tests performed and the consistency and supportability of Dr. Feather's opinions as well.

With regard to the consistency and supportability of Dr. Feather's opinions, the ALJ properly considered CE Dr. Chapa's January 3, 2013 report. The ALJ made clear that she considered Dr. Chapa's report and determined that his assertion regarding Leffler's "severe difficulty squatting and arising without support during his examination" was not supported by sufficient objective evidence within the medical evidence for the ALJ to find an inability to perform occasional postural activities as set forth in her RFC finding. AR 37. The ALJ went on:

> No treating medical source has noted extreme limitation in this area during their clinical examinations. Although the undersigned does not accept this degree of limitation, the undersigned does note that when a hypothetical residual functional capacity limiting an individual to no crouching along with limitations matching those set forth above was posed to the vocational expert there were still available jobs.

AR 37. The ALJ similarly identified her reasons for rejecting Dr. Feather's opinions:

> Overall, while Dr. Feather provided medical source statements that would suggest substantial disability, there was limited abnormality noted in his actual progress notes from the claimant's treatment and he did not pursue a particularly aggressive course of care consistent with such severe limitation. Moreover, while the undersigned does not accept these limitations, when presenting the vocational expert with a hypothetical individual restricted to standing/walking for only four hours in a day for only thirty minutes at a time and no stooping or bending, the vocational expert indicated there would still be significant jobs available.

AR 38. Thus, the Court can trace the path of the ALJ's reasoning in both rejecting Dr. Feather's opinions as controlling and in rejecting them as consistent with and

supported by other substantial evidence where the only "consistent" evidence (Dr. Chapa's report)[2] was a mere scintilla of evidence and was itself rejected for sufficiently articulated reasons. *See Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (stating that an ALJ must "sufficiently articulate [her] assessment of the evidence to assure us that the ALJ considered the important evidence . . . and to enable us to trace the path of the ALJ's reasoning").

Also, the ALJ committed no reversible error in assigning the State Agency nonexamining reviewers' opinions "some weight" where, as the Commissioner argues, the State Agency reviewers considered much the same evidence that Dr. Feather relied upon in support of the limitations to which he opined (1983 left toes amputation and January 2013 MRI) which did not cause them to conclude Leffler's exertional limitations were as extensive as Dr. Feather opined. The ALJ expressly addressed the fact that additional evidence came in after the State Agency reviewers provided their opinions:

> The remainder of the conclusions offered by the State agency evaluators were generally consistent with the medical evidence available at the time of their review, to which they offered specific references in support of their conclusions, and remain consistent with new evidence received at the hearing level.

AR 39. In light of that explanation, the Court does not find fault with the ALJ's weighing of the State Agency reviewers' conclusions where the other parts of the Decision (as discussed herein) fully show that the ALJ built a logical bridge between the evidence of record and her conclusions about the weight to be given the various medical opinions and the extent of Leffler's limitations as supported by the record evidence. *See Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013) ("an

---

[2] Leffler does not articulate to what extent or in what way Dr. Chapa's opinion was consistent with Dr. Feather's opinions, and in particular, Leffler does not explain how Dr. Chapa's opinion is consistent with Dr. Feather's opinion that Leffler needed to alternate between sitting and standing "at will."

ALJ must build an accurate and logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence").

The ALJ's Decision read as a whole and without nitpicking it makes clear why she did not specifically address the sit/stand component of Dr. Feather's opinions; her overt discussion of the other parts of Dr. Feather's opinions made unnecessary a pointed discussion of the "Yes" checkmark next to the question "Does your patient need the opportunity to shift at will from sitting or standing/walking." AR 584. Certainly, the ALJ's consideration of Dr. Feather's opinion that Leffler could stand and walk only four hours in an eight-hour day for only thirty minutes at a time was a proper way to consider Dr. Feather's opinions as a whole. In other words, the ALJ's failure to specifically reference Dr. Feather's opinion as to Leffler's need to alternate between sitting and standing "at will" does not render meaningless and insufficient the entirety of the ALJ's analysis of the Dr. Feather's opinions (as summarized above).

**B**

Next, Leffler argues that the ALJ's error in discounting Dr. Feather's opinion was not harmless where an ALJ has a general obligation to craft an RFC finding which accounts for all of the practical effects of all of the claimant's impairments. Leffler contends that the ALJ's omission of Dr. Feather's opinion that he needed to change positions "at will" resulted in an inaccurate RFC/concomitant hypothetical which, in a case decided at Step 5 requires remand, given the ALJ's burden of proof. The Commissioner argues that a reasonable finder of fact on remand could not credit Dr. Feather's cursory and contradictory opinion regarding Leffler's need to change positions "at will" or find that it rendered Leffler disabled, and the VE testified that a person who could sit only 60 minutes and stand/walk 30 minutes at a time could still do a significant number of jobs.

17

Leffler has somewhat conflated arguments to the extent he argues the ALJ committed an error at Step 4 and therefore at Step 5 as well where the latter argument is flushed out in context of Step 4. In any event, his Step 5 argument fails because the Court finds that even assuming the ALJ erred by omitting Dr. Feather's opinion that Leffler would need to alternate between sitting and standing/walking "at will," such error was harmless. An "administrative error may be harmless," *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) and the Court ought not remand a case to the ALJ where it is convinced that the ALJ will reach the same result. *Id.* SSR 83-12 states that "[i]n cases of unusual limitation of ability to sit or stand, a [vocational specialist] should be consulted to clarify the implications of the occupational base."

Here, the ALJ asked the VE at the hearing about the hypothetical individual's ability to, among other things, stand and walk up to 30 minutes at a time for a total of four hours a day and to sit up to 60 minutes at a time for a total of six hours a day and whether any of the previously identified jobs were still "okay." AR 104-05. The VE responded that the sedentary jobs would be available and that one remaining light job of rental consultant would be available, though the available jobs for it would be reduced in number. Later, the ALJ began to ask the VE, "Okay. If I were to add to that last hypothetical a sit/stand option – well I guess it's somewhat incorporated there because I said 30 minutes at a time, 60 minutes at a time, so I guess that's already part of that . . . ." AR 106-07. Still later at the hearing, Leffler's own attorney acknowledged to the VE during the hearing that, "I think you had basically covered the sit/stand option." AR 109.

In light of the above colloquies, the ALJ's weighing of Dr. Feather's opinions (done properly as discussed above), and the relevant authority, the Court is convinced that upon the presentation of a hypothetical to the VE that was identical to Dr. Feather's opinion (expressly providing for the need to alternate between

18

sitting and standing/walking "at will") that the ALJ would reach the same disability determination. *See Ketelboeter v. Astrue*, 550 F.3d 620, 626 (7th Cir. 2008) (ALJ did not commit error where the ALJ told the VE to assume that the claimant would "have to have a sit, stand option where he could sit or stand as needed during the day" because "as needed" would necessarily encompass frequent sitting and standing); *Buchholtz v. Barnhart*, 98 F. App'x 540, 547 (7th Cir. 2004) (ALJ properly took into account the erosion of the occupational basis where the ALJ had the VE testify to the possible jobs for an individual restricted to alternating between sitting and standing every twenty to twenty-five minutes).

## V

For the foregoing reasons, the Plaintiff's Motion for Summary Judgment (Doc. 11) is DENIED and the Commissioner's Motion for Summary Affirmance (Doc. 15) is GRANTED. This matter is now terminated.

*It is so ordered.*

Entered on July 29, 2016.


s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE